# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### CRIMINAL CASE NO. 3:07cr211-2

UNITED STATES OF AMERICA,  )
)
)
        vs.          )      **MEMORANDUM OF DECISION**
)           **AND ORDER**
)
VICTORIA L. SPROUSE.     )
_____)


**THIS MATTER** is before the Court on the Defendant Sprouse's Response to Order Concerning <u>Skilling v. United States</u> [Doc. 365] which the Court has construed as a motion for a new trial.[1]

## PROCEDURAL HISTORY

On November 16, 2007, the Defendant was charged by Superseding Bill of Indictment with conspiracy to commit mail, wire and bank fraud; mail fraud; conspiracy to money launder; promoting money laundering; money laundering; perjury; and obstruction of justice, in violation of 18 U.S.C. §§1349, 1341, 1956(h), 1956(a)(1)(A)(i), 1956(a)(3)(A), 1957, 1503, and

---

[1]In the first paragraph of that pleading, the Defendant states: "Sprouse contends that the recent landmark ruling of <u>Skilling</u> requires this Court to declare the sentencing moot, vacate her convictions and grant a new trial." [Doc. 365 at 1].

1623(a), respectively. This indictment was superseded on three occasions, with the final and Fourth Superseding Bill of Indictment being filed on November 6, 2008. [Doc. 117]. In that indictment, the Defendant faced two charges of conspiracy to defraud the United States, in violation of 18 U.S.C. §371 (Counts 1 and 35); three charges of mail fraud, in violation of 18 U.S.C. §§1341 and 2 (Counts 2 through 4); nine charges of bank fraud in violation of 18 U.S.C. §1344 (Counts 5 through 12, Count 37); two charges of conspiracy to money launder, in violation of 18 U.S.C. §1956(h) (Counts 24 and 38); one charge of promoting money laundering, in violation of 18 U.S.C. §1956(a)(1)(A)(i) (Count 25); one charge of money laundering, in violation of 18 U.S.C. §1957 (Count 27); four charges of perjury, in violation of 18 U.S.C. §1623 (Counts 28 through 31); three charges of obstruction of justice, in violation of 18 U.S.C. §§1512 and 1519 (Counts 32 through 34); and one charge of conspiracy to commit mail, wire and bank fraud and making false statements to banks, in violation of 18 U.S.C. §1349 (Count 36). [Doc. 117]. Each count of this indictment which charged a scheme or artifice to defraud included language accusing the Defendant of involvement with a scheme or artifice "to defraud financial institutions and others of money and their *intangible right to honest services*." [Doc. 117, at 8-9; 19; 20; 36-37; 42-43] (emphasis added).

The counts charging perjury and obstruction of justice were severed and were subsequently dismissed without prejudice. [Doc. 163; Doc. 259]. After eight days of trial, the jury returned a verdict on April 1, 2009 finding the Defendant guilty of every count submitted to the jury except one.[2] [Doc. 236].

On May 19, 2009, Anderson & Turpening filed a notice of appearance as new counsel for the Defendant. [Doc. 253]. The Defendant's court-appointed counsel who represented her at trial were allowed to withdraw. [Doc. 256].

The initial draft of the Defendant's presentence report was filed in April 2010. [Doc. 311]. Both the Government and defense counsel filed objections to the report. [Doc. 315; Doc. 317; Doc. 319]. The revised presentence report was filed on May 21, 2010. [Doc. 323].

On June 24, 2010, the United States Supreme Court ruled that 18 U.S.C. §1346, which proscribes fraudulent deprivations of the intangible right of honest services, is confined to only bribery and kickback schemes and does not encompass undisclosed self-dealing by a public official or private employee that furthers her own financial interests while purporting to act in the interests of those to whom a fiduciary duty is owed. Skilling v. United States,

---

[2]The jury acquitted the Defendant on Count Two which charged her with mail fraud by a scheme and artifice to defraud Southland Mortgage of money and the intangible right to honest services on July 24, 2001. [Doc. 117 at 19; Doc. 236 at 2].

___ U.S.___, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010).  On August 5, 2010, the Court ordered the parties to address the impact, if any, of the Supreme Court's ruling. [Doc. 362].  The parties filed their responses on August 10 and August 16, 2010.  [Docs. 363, 365].  The Court construed the Defendant's response as a motion for a new trial, and a hearing was conducted on August 26, 2010.  The Defendant's sentencing hearing has been postponed pending a ruling on this motion.

## TIMELINESS OF THE MOTION

Federal Rule of Criminal Procedure 33 provides that on a "defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A motion for a new trial on any ground other then newly discovered evidence must be brought within fourteen days after the jury verdict.  Fed. R. Crim. P. 33(b)(2).  However,

> under Rule 45(b)(1)(B), if for some reason the defendant fails to file the underlying motion for new trial within the specified time, the court may nonetheless consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect.

Fed. R. Crim. P. 33, Advisory Committee Notes (2005 Amendment).[3]  Rule 45 states in pertinent part that "the court on its own may extend time ... after the

---

[3] The 2005 Amendments to Rule 33 set the deadline for filing a motion for new trial at fourteen (14) days.

time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B).

Thus, the issue is whether the Defendant's delay in seeking a new trial was the result of excusable neglect. The standard for determining the existence of excusable neglect is set out in <u>Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership</u>, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), which has been applied to criminal cases by the decision in <u>Stutson v. United States</u>, 516 U.S. 193, 116 S.Ct. 600, 133 L.Ed.2d 571 (1996). <u>See</u> <u>United States v. Turner</u>, 2010 WL 6267790 (N.D.W.Va. 2010) (noting that the "Fourth Circuit has yet to discuss what constitutes 'excusable neglect' in the context of a late-filed Rule 33 motion" and applying the <u>Pioneer</u> factors).

The Supreme Court in <u>Pioneer</u> articulated a non-exclusive list of factors a district court should consider when determining whether excusable neglect has been established. <u>Pioneer,</u> 507 U.S. at 395. Those factors include: 1) the reason for the delay, including whether it was within the reasonable control of the moving party; 2) the danger of prejudice to the non-moving party; 3) the length of the delay and its impact on judicial proceedings; and 4) whether the movant acted in good faith. <u>Id.</u> In determining whether a moving party has established excusable neglect, the Supreme Court noted that the

"determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."  Id.

> The ordinary meaning of "neglect" is "to give little attention or respect" to a matter, or, closer to the point for [this] purpose[ ], "to leave undone or unattended to *esp[ecially] through carelessness*." The word therefore encompasses both simple, faultless omissions to act and, more commonly, omissions caused by carelessness .... Hence, by empowering the courts to accept late filings "where the failure to act was the result of excusable neglect," Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.

Id. at 388 (italics in original, underlined emphasis added).

The first area of inquiry is the reason for the delay.  In this respect, the facts of this case are not ordinary.  The Defendant's motion arose from the Court's directive that the parties address the Supreme Court's decision in Skilling, the latter stages of which coincided with the prosecution and trial in this case.  Therefore, the timeline of Skilling becomes pertinent to the reasons for the delay in the filing of the present motion.

On January 6, 2009, the United States Court of Appeals for the Fifth Circuit in United States v. Skilling held that a jury may convict a defendant of conspiracy to commit honest services wire fraud based on his use of fraudulent means to achieve his company's goal of certain earnings projections.  554 F.3d 529 (5th Cir. 2009).  The defendant in Skilling petitioned

the Supreme Court for a writ of *certiorari* on May 11, 2009.  Skilling, 2009 WL 1339243.  On October 13, 2009, the United States Supreme Court granted *certiorari* to hear Skilling's case.  Skilling, 130 S.Ct. 393, 175 L.Ed.2d 267 (2009).  On June 24, 2010, the Supreme Court reversed the Fifth Circuit and determined that the scope of honest services fraud was substantially more limited than had been previously applied.  130 S.Ct. 2896.

Defendant Sprouse was convicted by jury verdict on April 1, 2009.  At that time, there was no basis on which to move for a new trial as the Supreme Court had not yet even granted *certiorari* in Skilling.  "Without the benefit of the Supreme Court's opinion . . . any argument based on Skilling [and the issues therein] would have been purely speculative."  United States v. Maricle, 2010 WL 3927570 (E.D. Ky. 2010).  It was not until over a year later – but before the entry of final judgment in this case – that the Supreme Court decided Skilling and substantially limited the honest services fraud statute.  The Supreme Court's decision in Skilling therefore was an "intervening circumstance[ ] beyond the party's control."  Pioneer, 507 U.S. at 388.  A "significant intervening change in the law is a valid reason for delay in filing [a] postverdict motion...."  Maricle, supra.; accord United States v. Munoz, 605 F.3d 359, 371 (6th Cir. 2010), cert. denied 131 S.Ct. 1813, 79 USLW 3344 (2011).  This factor, therefore, weighs heavily in favor of the Defendant.

The next factor requires the Court to consider the potential prejudice to the Government in allowing the untimely motion. Notably, the Government has not asserted any opposition to the Defendant's motion based on this factor. Considering all the circumstances, the Court does not find that any undue prejudice would result to the Government. The fact that the Government may be required to prepare and present its case a second time would be equally true had the motion been timely filed. <u>Munoz</u>, 605 F.3d at 371-72. Moreover, the prosecutors in this case were likely acutely aware of the progress of the <u>Skilling</u> case and its potential impact on this and other honest services prosecutions. Nevertheless, the Government made the strategic decision to try this case primarily as an honest services case. The possibility that this case would have to be retried, therefore, was not entirely unexpected. The Court therefore finds that this factor also weighs in favor of the Defendant.

The third <u>Pioneer</u> factor the Court must consider is the length of the delay in seeking leave to file a motion for a new trial and the impact, if any, on the proceedings. Even though Defendant's motion was filed more than a year after the verdict, the case only became ripe for sentencing at the same time as the decision in <u>Skilling</u> because of the time required for the preparation of the extensive presentence investigation report in this matter. [Doc. 315].

Moreover, the Court's inquiry regarding the impact of <u>Skilling</u> on this case was issued only five weeks after the Supreme Court's decision, and the Defendant's request for a new trial based on that decision was filed only eleven days later. [Doc. 365].

At the hearing on this matter, the Government argued that the Defendant's new attorneys "sat" on the <u>Skilling</u> issue once the Supreme Court's decision was published, claiming that Government counsel was told by defense counsel that a strategic decision had been made to forfeit any such motion. Neither at the hearing nor in pleadings has defense counsel acknowledged such a strategy. Even if defense counsel did indeed "sit" on the issue, this factor does not necessarily militate against the Defendant. <u>See, e.g.</u>, <u>United States v. Rezko</u>, ___ F.Supp.2d ___, 2011 WL 830459 **3 (N.D.Ill. 2011) (noting that counsel's decision to wait for cases to provide guidance in applying <u>Skilling</u> weighed in favor of a defendant). "<u>Pioneer</u> makes clear that the standard is a balancing test, meaning that a delay might be excused even where the reasons for the delay are not particularly compelling." <u>United States v. Brown</u>, 133 F.3d 993, 997 (7th Cir. 1998), <u>cert. denied</u> 523 U.S. 1131, 118 S.Ct. 1824, 140 L.Ed.2d 960 (1998).

> [The] delay was not clearly inordinate *here*, given the sensitive posture in which [new counsel] took over the case and the unique difficulties [they] presumably faced as a result. See, Anne M. Voigts, <u>Narrowing the Eye of the Needle: Procedural Default,</u>

Habeas Reform, and Claims of Ineffective Assistance of Counsel, 99 Colum. L.Rev. 1103, 1131 (1999) (noting that, where successor counsel will be arguing former counsel's ineffective assistance, former counsel's "incentives not to help the client ... [may] affect cooperation with successor counsel"); *cf.* Massaro [v. United States], 538 U.S. [500,] 506, 123 S.Ct. 1690[, 155 L.Ed.2d 714 (2002)] (noting that appellate counsel may be in an "awkward position vis-'a-vis trial counsel," as "trial counsel will be unwilling to help appellate counsel familiarize himself with a record for the purpose of understanding how it reflects trial counsel's own incompetence."). [The] district court is in the best position to know how long a diligent successor counsel would require to research and prepare a new-trial motion under the circumstances presented by any given case. Thus, the delay factor does not clearly favor the government.

Munoz, 605 F.3d at 372.

The Court also finds that because most of the delay before filing the motion is attributable to the preparation of the presentence report, and that any portion of the delay attributable to counsel's actions was of short duration and for the purpose of allowing the Court to address Skilling's effect on the case, the period of delay was reasonable and there has not been a waste of judicial resources. Id. at 372 n.7; Maricle, 2010 WL 3927570. For these reasons this Pioneer factor also weighs in the Defendant's favor.

Furthermore, the Government does not argue that the motion is brought in bad faith. Indeed, the Government concedes that, in light of Skilling, "the instructions to the jury regarding the honest services theory were erroneous in defining the honest services theory as extending beyond bribery and

kickbacks. And, of course, there was no evidence here that Sprouse accepted either bribes or kickbacks in her role as a closing attorney." [Doc. 363 at 3]. The Court therefore finds that no bad faith was involved. Munoz, 605 F.3d at 372; Maricle, 2010 WL 3927570.

Having weighed the Pioneer factors, the Court finds the unusual circumstances surrounding the timing of the Supreme Court's decision in Skilling support a finding of excusable neglect. Munoz, 605 F.3d at 372-73 (excuse for the delay usually has the most import). The other factors also weigh in favor of the Defendant. The decision as to whether there was excusable neglect is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Id. at 368; Rezko, 2011 WL 830459. The Court therefore finds and concludes that the delay in filing of the motion for new trial was the result of excusable neglect, and based thereon the Court will entertain the motion.

## STANDARD OF REVIEW

Rule 33 provides that the trial court may, on a defendant's motion, grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. The Fourth Circuit has "observed that a court 'should exercise its discretion to grant a new trial 'sparingly,' and that it should do so 'only when the evidence weighs heavily against the verdict.'" United States v. Perry, 335 F.3d 316, 321

(4th Cir. 2003), <u>cert. denied</u> 540 U.S. 1185, 124 S.Ct. 1408, 158 L.Ed.2d 91

(2004) (quoting <u>United States v. Wilson</u>, 118 F.3d 228, 234 (4th Cir. 1997)).

> Rule 33 allows a district court to grant a new trial in the interest of
> justice.  When the motion attacks the weight of the evidence, the
> court's authority is much broader than when it is deciding a motion
> to acquit on the ground of insufficient evidence.  In deciding a
> motion for a new trial, the district court is not constrained by the
> requirement that it view the evidence in the light most favorable
> to the government.  Thus, it may evaluate the credibility of the
> witnesses.  When the evidence weighs so heavily against the
> verdict that it would be unjust to enter judgment, the court should
> grant a new trial.

<u>United States v. Campbell</u>, 977 F.2d 854, 860 (4th Cir. 1992), <u>cert. denied</u> 507

U.S. 938, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993) (quoting <u>United States v.</u>

<u>Arrington</u>, 757 F.2d 1484, 1485 (4th Cir. 1985)).  "Rule 33 confers broad

discretion on a district court" in ruling on the motion.  <u>United States v.</u>

<u>Prescott</u>, 221 F.3d 686, 688 (4th Cir. 2000).  "[T]he interest of justice is the

touchstone for consideration" of a Rule 33 motion.  <u>United States v. Mitchell</u>,

602 F.2d 636, 639 (4th Cir. 1979).  "Any error of sufficient magnitude to require

reversal on appeal is an adequate ground for granting a new trial."  3 Charles

Alan Wright & Arthur Miller, <u>Federal Practice & Procedure</u>, §556 (3d ed.

2004).  "[I]t is widely agreed that Rule 33's 'interest of justice' standard allows

the grant of a new trial where substantial legal error has occurred."  <u>Munoz</u>,

605 F.3d at 373 (citing <u>United States v. Wall</u>, 389 F.3d 457, 474 (5th Cir.

2004)), <u>cert. denied</u>, 544 U.S. 978, 125 S.Ct. 1874, 161 L.Ed.2d 730 (2005).

In the present case, the Government concedes that "there was no evidence here that Sprouse accepted either bribes or kickbacks in her role as a closing attorney." [Doc. 363 at 3]. The Government concedes that legal error occurred in two ways: (1) by virtue of the language in the bill of indictment charging honest services fraud; and (2) by virtue of the jury instructions which defined the honest services fraud theory as extending beyond bribery and kickbacks. [Doc. 363 at 2-4]. The Government contends, however, that because trial counsel failed to preserve any issue concerning honest services fraud, a plain error standard of review should be applied in reviewing these legal errors.

The Defendant disputes that the plain error standard should apply, arguing that the issue was preserved in various ways throughout the trial, but that the Court's rejection of objections ultimately caused trial counsel to desist from raising the issue. Contrary to the Defendant's argument, however, there is nothing in the record to indicate that trial counsel argued that the honest services fraud statute was void for vagueness or should be limited to bribes and kickbacks.

"The plain-error standard applies even if, as is the case here, there were no legal grounds for challenging the instructions at the time they were given, but such legal grounds have since arisen due to a new rule of law arising

between the time of conviction and the time of appeal." <u>United States v. Pelisamen</u>, __ F.3d __, 2011 WL 1378640 **3 (9th Cir. 2011) (citing <u>Johnson v. United States</u>, 520 U.S. 461, 464-68, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). For these reasons, the Court will apply the plain error standard of review pursuant to Federal Rule of Criminal Procedure 52(b).

## ANALYSIS

As the Supreme Court explained in <u>United States v. Marcus</u>, ___ U.S.___, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010):

> Lower courts, of course, must apply the Rule as [the Supreme] Court has interpreted it. And the cases that set forth [that] interpretation hold that a[ ] [reviewing] court may, in its discretion, correct an error not raised at trial only where the [defendant] demonstrates that (1) there is an "error;" (2) the error is "clear or obvious, rather than subject to reasonable dispute;" (3) the error "affected the [defendant's] substantial rights, which in the ordinary case means" it "affected the outcome of the district court proceedings;" and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

<u>Marcus</u>, 130 S.Ct. at 2164; <u>see also</u> <u>United States v. Olano</u>, 507 U.S. 725, 113 S.Ct. 1770, 123 L. Ed. 2d 508 (1993); <u>United States v. Brewer</u>, 1 F.3d 1430, 1434-35 (4th Cir. 1993).

**Error and Clear Error**

The Government concedes the first two elements of the plain error review, namely that there was an error in the trial, and in light of Skilling, that the error was clear, obvious and not subject to reasonable dispute. [See Doc. 363 at 3 (conceding that "in light of the Supreme Court's decision in Skilling, the instructions to the jury regarding the honest services theory were erroneous in defining the honest services theory as extending beyond bribery and kickbacks" and that "there was no evidence here that Sprouse accepted either bribes or kickbacks in her role as a closing attorney")]. Even though Skilling was decided after the trial of this matter, the errors regarding the honest services issue are clear errors because "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).  The Government also concedes that the indictment itself was defective to the extent that it charged honest services fraud. [Id. at 2]. Despite these concessions, the Government argues that these errors do not rise to the level of plain error because they did not affect a substantial right of the Defendant or affect the fairness or integrity of the proceedings.

**Substantial Right**

In order for a defendant to meet the third element of plain error review, it must be shown that the error "'affect[ed] substantial rights,' that is, that the error actually affected the outcome of the proceedings."[4] <u>United States v. Hastings</u>, 134 F.3d 235, 240 (4th Cir. 1998), <u>cert. denied</u> 523 U.S. 1143, 118 S.Ct. 1852, 140 L.Ed.2d 1100 (1998) (quoting Fed. R. Crim. P. 52(b) and citing <u>United States v. Turcks</u>, 41 F.3d 893, 898 (3d Cir. 1994), <u>cert. denied</u> 514 U.S. 1074, 115 S.Ct. 1716, 131 L.Ed.2d 575 (1995)). The Court must, therefore, look to the errors in the context of the proceeding to determine whether the outcome was affected.

The first point of examination is the jury instructions that all agree are erroneous. In connection with all of the mail fraud counts, for instance, this Court instructed the jury as follows:

> In order for you to convict the defendant of any one or more of the charges contained in Counts Two through Four of the bill of indictment, the government must prove each of the following essential elements beyond a reasonable doubt as to the count under consideration:
>
> 1. The defendant knowingly devised or knowingly participated in a scheme or artifice to defraud, *including the right to*

---

[4] In this sense, inquiry as to whether the error affected a substantial right is essentially the same as harmless error review, except that the burden is on the defendant to show that the error was not harmless, while on harmless error review the burden is on the Government to show that the error was harmless. <u>Hastings</u>, 134 F.3d at 240.

*honest services* and/or knowingly devised or knowingly participated in a scheme or artifice to obtain money or property by means of false or fraudulent pretenses, representations or promises, as detailed in the indictment;

2.     The scheme or artifice to defraud and/or the pretenses, representations or promises were material;

3.     The defendant did so with the specific intent to defraud;

4.     In advancing, or furthering, or carrying out this scheme to defraud, *including the right to honest services* and/or scheme to obtain money or property by means of false or fraudulent pretenses, representations or promises, the defendant caused any matter or thing to be sent or delivered by private and commercial mail carriers;

5.     This conduct affected a financial institution[.]

...

The phrases "any scheme or artifice to defraud" and "any scheme or artifice for obtaining money or property" mean any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value. *The term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services, as I will define that phrase for you.*

...

It is not necessary for the government to prove that the defendant was actually successful in defrauding anyone or successful in obtaining money or property by means of false or fraudulent pretenses, representations, or promises. It is not necessary for the government to prove that anyone has lost any money or property as a result of the scheme or plan to defraud or the scheme or plan to obtain money or property by means of false or fraudulent pretenses, representations, or promises. An unsuccessful scheme or plan to defraud or to obtain money or property by means of false or fraudulent pretenses,

representations, or promises is as illegal as a scheme or plan that is ultimately successful.

*A "scheme or artifice to defraud" includes a scheme to deprive another person of intangible as well as tangible property rights. Intangible property rights means anything valued or considered to be a source of wealth, including, for example, the right to honest services. To deprive another of the intangible right to honest services means to violate, or to cause an agent of another person to violate, the agent's duty to provide honest services to the principal.* The government must prove that the agent intended to breach a fiduciary duty, and that the agent foresaw or reasonably should have foreseen, that the principal might suffer an economic harm as a result of that breach.

In this regard, the relationship of agency is based on an agreement by a principal that his or her agent shall act on his behalf. *An attorney may have a duty of honest services arising either from the attorney's ethical obligations or the provisions of the Good Funds Settlement Act. Likewise, a notary public may have a duty of honest services arising from the notarial standards prescribed by the laws of the State of North Carolina.*

The Good Funds Settlement Act reads in pertinent part as follows:

The settlement agent shall not disburse any of the closing funds prior to the ... verification that the closing funds used to fund disbursement are deposited in the settlement agent's trust or escrow account in one or more forms prescribed by law. The settlement agent shall not disburse any of the closing funds prior to the recordation of any deeds or loan documents required to be filed by the lender, if applicable.

*In order to prove the deprivation of the right of honest services, the government must prove that the agent intended to breach his or her fiduciary duty and foresaw or reasonably should have foreseen that the breach would create an identifiable economic risk for the principal even if that loss does not occur.*

[Doc. 383-7, at 2-8] (emphasis provided). The instructions with regard to the other fraud counts were of a similar nature. The instructions setting out the erroneous definition of honest services fraud permeated the jury's charge.

In connection with the two conspiracy Counts (Counts 1 and 35) the Court instructed the jury that in order to find the Defendant guilty of the count under consideration, the Government must prove each of the following essential elements beyond a reasonable doubt:

> In or about the dates alleged in the indictment, the conspiracy to make false statements to banks and/or to commit mail, wire and bank fraud was formed, reached, or entered into by two or more persons.

> Two, at some time during the existence of the conspiracy, the defendant knew the purpose(s) of the agreement, and, with that knowledge, then deliberately joined the conspiracy.

> Three, at some time during the existence of the conspiracy, one of its alleged members knowingly performed one of the overt acts charged in the indictment and did so in order to further or advance the purpose of the agreement.

> Four, the defendant acted with the specific intent to defraud; and

> Five, all such acts were done knowingly and intentionally.

[Doc. 406, at 18-19]. The instructions also defined the objects of the conspiracy, including the essential elements of each of the four offenses of making false statements to banks and wire, mail and bank fraud. [Id., at 19]. The references to the right to honest services, and the definitions related

thereto, were repeated throughout the jury instructions concerning the other counts. Thus, the honest services error was clearly imported into the instructions on the conspiracy counts. The Government has conceded that the honest services instruction also related "to every count on which Sprouse was convicted, as the money laundering counts charged that the proceeds used in the relevant transactions derived from the mail/wire/bank fraud charges that included the honest services theory." [Doc. 363 at 3 n.2].[5] In other words, as to each count of the indictment under consideration, the jury was clearly instructed that the Defendant could be convicted for honest services fraud and/or money or property fraud as an alternative theory.

These instructions need to be taken in conjunction with the language employed in the indictment, which the jury instructions tracked. The charges repeatedly referred to honest services fraud in connection with every fraud count charged. [Doc. 117, at 6-7, 8-9, 19, 20, 36-37, 42-43, 47]. In addition, the jury was provided a copy of the indictment for use in their deliberations. As to every fraud count on which the Defendant was convicted the indictment contained language charging her with being involved with schemes and artifices "to defraud financial institutions and others of money and their

---

[5] A printed copy of the instructions was provided to the jury for their use during deliberations. [Doc. 383-7 at 10-13].

intangible right to honest services." [Doc. 117, at 8–9; 19-20; 36-37; 42-43; 47]. It is undisputed that the indictment charged alternative theories of honest services fraud and money or property fraud. It is also undisputed that, to the extent the indictment charged honest services fraud, it was defective. Skilling, 130 S.Ct. at 2934.

The language of the conspiracy counts of the indictment charge honest services fraud in a manner contrary to that allowed pursuant to Skilling. In each conspiracy count, it is alleged that the objects of the conspiracy were: (1) mail fraud, in violation of 18 U.S.C. §§1341 and *1346* (which defines honest services fraud); (2) wire fraud, in violation of 18 U.S.C. §§1341 & *1346*; (3) bank fraud, in violation of 18 U.S.C. §§1341 & *1346*; and (4) making false statements to banks, in violation of 18 U.S.C. §1014. [Doc. 117, at 1-18; 36-41]. The language of §1346 provides that "[f]or the purposes of this chapter [chapter 63], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §1346. The preamble of the indictment which pertains to both of these conspiracy counts sets out regulatory provisions describing the ethical obligations of an attorney to her clients, rules related to the maintenance of trust accounts, and the Good Funds Settlement Act applicable to closing attorneys. [Doc. 117, at 6-7]. Each of these objects specifically refers to

Section 1346, except for the one that refers to Section 1014. Importantly, however, the indictment does not contain a count charging any substantive violation of 18 U.S.C. §1014, but only violations that could be fulfilled by evidence of honest services fraud.

For these reasons, the Government does not vigorously defend the convictions on most counts [Doc. 363 at 4] – the error so permeated the proceedings as to these counts that it is impossible to tell whether the jury may well have convicted the Defendant based entirely on behavior that does not violate the statute. A "constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory." Skilling, 130 S.Ct. at 2934 (citing Yates, 354 U.S. 298). "[A] general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is [legally or constitutionally] insufficient, because the verdict may have rested exclusively on the insufficient ground." Zant v. Stephens, 462 U.S. 862, 881, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983);

> [V]acatur is "constitutionally compelled" "where a provision of the Constitution forbids conviction on a particular ground [and] the general verdict may ... have rested on that ground." Given the overbreadth of the jury instruction and the resulting uncertainty about the basis for the verdict, the ... convictions ... [may have rested on the unconstitutional ground].

Stayton v. United States, __ F.Supp.2d __, 2011 WL 691238 **7 (M.D. Ala. 2011) (quoting Clark v. Crosby, 335 F.3d 1303, 1309 (11th Cir. 2003); Griffin v. United States, 502 U.S. 46, 53, 112 S.Ct. 466, 115 L.Ed.2d 371 (1991)), cert. denied, 540 U.S. 1155, 124 S.Ct. 1159, 157 L.Ed.2d 1052 (2004).

This would appear to resolve the question at hand and dictate that the Defendant's conviction must be set aside. The Government argues, however, that the convictions on the conspiracy counts (1 and 35) survive a plain error review because the verdict sheet contained a section in which the jury unanimously found the object(s) of each conspiracy. [Doc. 236 at 2, 6]. The jury determined that the object of each conspiracy included making false statements to banks in addition to mail, wire and bank fraud. [Id.]. From this, the Government argues that the jury found the Defendant guilty of conspiracy to make false statements to banks, an alternative theory on which the convictions remain valid. In support of its argument, the Government cites United States v. Pelisamen, ___ F.3d___, 2011 WL 1378640 (9th Cir. 2011). In that case, the jury was given a fraud instruction that allowed for conviction on an alternate theory of honest services fraud, even though the honest services instruction was erroneous:

> [T]he district judge instructed the jury that it could convict Defendant if it found that he had *either* (1) "defrauded the heirs of the Estate ..." *or* (2) "deprived the heirs ... of their right to honest services," *or* (3) done both. The verdict form permitted a

conviction on the wire fraud charge if the jury found the Defendant guilty of a scheme or plan to defraud the heirs "and/or" a scheme or plan to deprive them of honest services. The jury checked the boxes for both forms of fraud.

Id. (emphasis in original). Given the lack of evidence of bribes or kickbacks, the court concluded that the inclusion of the honest services fraud in the jury instructions and verdict sheet was supported by neither the indictment nor the evidence and therefore constituted clear error. Id. at *4. The court proceeded to analyze whether the error affected the outcome of the trial. Id. In so doing, it noted that the indictment had focused exclusively on the defendant's theft of "money" from the estate, as did the evidence. Id. at *5. The Court then noted, "most tellingly, the special verdict form indicates that the jury did convict on the basis of a theory other than honest services fraud." Id. Based on this language in Pelisamen, the Government claims that in the present case the errors did not affect the outcome regarding the conspiracy counts because the jury found the Defendant guilty of conspiracy to make false statements to banks. The Government thus concludes that "the erroneous honest services instructions to the jury were harmless, and certainly did not rise to the level of plain error." [Doc. 363 at 5].

The facts and circumstances found in Pelisamen, however, are markedly different from this case. In Pelisaman, the defendant was charged not with a conspiracy to defraud containing several objects, but rather only

24

with wire fraud. The bill of indictment, moreover, at no point charged the defendant with honest services fraud. Id. ("The indictment does not mention 18 U.S.C. §1346[.]"). The Government acknowledges that in the present case, unlike Pelisamen, all of the evidence presented at trial related to honest services fraud:

> [T]here was no separate proof regarding the Section 1014 [false statements to banks] object of the conspiracies. The evidence about Defendant's lies all were the *same false statements to lenders that formed the bases for mail fraud, wire fraud, and bank fraud objects of the conspiracy.* For example, the evidence established that Defendant lied on the HUD-1 Settlement Statements about who provided the cash at closing and allowed forgeries on the HUD-1s and that the lies on those HUD-1 Settlement Statements were sent to the banks for approval in order to obtain loans. As another example, the evidence established that Defendant lied on the preliminary title opinions about the owners of the properties and that title commitments with the owner name from the preliminary title opinions are required by lenders before they issue loans.

[Doc. 395 at 6 n.4](emphasis added).[6]

The Government argues nonetheless that there "is simply no 'plausible interpretation of the evidence at trial under which the jury might have convicted on an 'intangible rights' theory without [also] finding a scheme to obtain property." [Doc. 363 at 4]. With this assertion the Government brings

---

[6]Indeed, even the evidence that the Government now wants to adopt as the basis for a conspiracy/false statements verdict was presented at trial as evidence of honest services fraud.

into sharp focus the precise issue before the Court in determining whether the honest services issues affected the outcome as to the conspiracy counts. This goes beyond a mechanical analysis of whether the jury was given an alternative on the verdict form that allowed for a conviction without a finding of honest services fraud.  Rather, the Court must evaluate the conceded errors in the full context of the trial, particularly in light of the theories on which the Government tried the case and the evidence it presented.  For this reason, the Government's opening statement, manner of examining witnesses, and closing arguments are particularly relevant to the substantial right inquiry. United States v. Riley, 621 F.3d 312, 323-27 (3d Cir. 2010); Skilling, 638 F.3d 480, 483 (5th Cir. 2011).

The primary theme of the Government's opening statement was that the Defendant had engaged in undisclosed self-dealing as a private employee which furthered her own financial interests while purporting to act in the interest of those to whom she owed a fiduciary duty, i.e., that she committed honest services fraud:

> The first witness for the government will be an expert and that expert will testify as to the role of a lawyer in a residential real estate closing. ... [T]he lawyers sits in the middle of a residential real estate closing.  The lawyer functions as a gatekeeper. ... But the lawyer does not represent as a client merely the buyers in these transactions, nor merely the seller[.] The lawyer represents as a client the lender as well.  The lender being the institution that is providing the loan, in this case the mortgage proceeds.  And as

such, you will hear that the lawyer has the duty, not just towards the buyer, but also towards the lender that any client would expect of their lawyer, and you might expect of a lawyer you hired: Tell the truth. Keep the client reasonably informed about the matter. Be honest and upright in their dealings with the client, both the lender and the buyer[.] ... Victoria Sprouse was not honest with her clients[.]

...

[Y]ou will see that although the lender is the one loaning the money in this [real estate] transaction, for those of you who bought a house, the lender is not there. The bank is simply not at the table when you sign all the documents to close the loan. Because the lender can't be there and they're the one loaning the money, they hire the lawyer to represent them. Again, they hire the lawyer to tell the truth; to be their eyes and ears in the transaction and tell the truth about what is really going on with this transaction.

...

[T]he lawyer ... receives the money that the buyer is required to pay at closing. And the lawyer needs to tell the truth about who pays. Is it the buyer? Is it somebody else? Defendant, Victoria Sprouse, did not tell the truth, the evidence will show, about that basic thing. ... The lawyer is also required to tell the truth about another thing that is basic to any real estate transaction: Who owns the property? You will see that the lawyer is hired to do, among other things, research to figure out is the seller really the owner of the property? You would want the seller to own the property that they [sic] are selling and the lawyer is hired to determine that. ... You will hear over and over again that the defendant, Victoria Sprouse, lied about who pays, who owns and other important, basic, simple facts in these real estate transactions.

...

You will learn in this case that the defendant Sprouse was not just the lawyer, she was also a notary public. ... [T]he purpose of a notary public is to prevent forgeries. The purpose of a notary public is to prevent fraud, especially with important documents like

this. And the defendant took an oath to become a notary public to the people of North Carolina. And with that oath, she took on the responsibility to prevent forgeries and false notarizations. You will hear in this case that over a dozen times, more than that, she falsely notarized documents, documents so important as deeds in this case, a piece of paper that transfers ownership of the house. ... in some cases you will hear evidence that the person wasn't even there. They weren't even there the day she notarized their signature in her office. Someone else forged their name, the defendant Sprouse fixed her seal saying  -  lying that the person personally appeared before her that day when they didn't.

...

The defendant, Victoria Sprouse, took on First Charter Bank as her client in this case, as lawyer to client, in order to refinance loans that were being brought back from Ohio Savings because they were fraudulent. The defendant, Victoria Sprouse, however, did not tell her new client that she was refinancing loans that were said to be fraudulent, that she knew were fraudulent because she did the loans in the first place. Instead, at her table in her office she closed those new loans for First Charter, her new client, and she didn't tell them about it. Instead, she stuck it to them. She took more fees in order to refinance her own fraud and to keep her and the rest of the conspiracy out of trouble. ... [T]he motive ... for these lies by the defendant Sprouse ... was fees, lawyer's fees.

[Doc. 368, at 5-6; 7-8; 11-12; 21-22].

The Government further asserted that Sprouse defrauded lenders by representing that the purchaser was making the downpayment on the property when, in fact, it was made by a third party. [Id. at 14-16]. It also argued that Sprouse defrauded lenders by affirmatively representing that property was to be a primary residence when it was, instead, to be a secondary residence or investment property. [Id. at 24-26]. The Government, however, made no

assertion – and produced no evidence at trial – that she did so for the purpose of accepting bribes or kickbacks.  Id.  In fact, the Government acknowledged that there was no evidence that (1) the Defendant ever received a "piece of the action" from the money or property fraud schemes; (2) she knew about any of the side deals; or (3) she selected any of the real estate appraisers.

The Government's focus on the honest services fraud theory continued during the presentation of evidence.  The Government's lead witness was Richard Poe, a licensed attorney[7] who testified as an expert regarding the lawyer's role and ethical duties in real estate closings.  Almost every question posed to Mr. Poe or answered by him addressed the issue of honest services fraud.  [Doc. 383-3 at 1-41].  Poe opined:

> Lenders will want to know and care very deeply about whether the borrower that they're taking an application from intends to use the property as their primary residence or as a secondary residence or an investment property.... Typically, you get a much better, more favorable interest rate if you're a buyer if it's going to be your primary residence ... than you would if it was a secondary residence or investment property.
>
> ...
>
> One of the main things a lender will look to when deciding whether to make a loan is to make sure that that borrower, that

---

[7] The Court takes judicial notice of the public record of the North Carolina State Bar and the Wake County Superior Court reflecting that Mr. Poe was disbarred in June 2010, after the conclusion of the trial. [Consent Order of Disbarment, 10 CvS 1027 Wake County, June 30, 2010, available at: http://www.ncbar.gov/orders/poe,%20 richard%20s%20consent%20order%20of%20disbar%20ocr.pdf] (last visited June 6, 2011) (attached hereto as Attachment 1).

proposed borrower actually has a stake in the property that they're buying and trying to finance.  Again, ... if you have a lot of money in a property, you're not very likely to default on the payment, the mortgage payment and lose it through a foreclosure. A lender cares very deeply about how much money you're intending to put down out of your own hard earned money. ... [Lenders] care whether the source of the down payment is the buyer versus a relative[.]

...

The lawyer in most real estate transactions is representing both the buyer and the lender.... [Pursuant to] specific Rules of Professional Conduct ... a closing attorney is deemed to represent, ... both the buyer and the lender[.]... The lender [requests a Preliminary Title Opinion from the lawyer which] shows the status of the title according to the public records on the date and time that the examiner is actually down at the courthouse doing their examination.

[Doc. 368 at 56-57; 58-59; 65-67].

Poe also opined that documents used in a real estate transaction must be notarized if there is a requirement of public recordation.  [Doc. 369, at 15]. Such notarized documents should be recorded in the county office on the same day as the closing. [Id. at 17].  Poe testified that the real estate closing attorney represents both the buyer and the lender although the lender almost never attends the closing. [Id. at 19-20].  "The lawyer, in most cases, is the eyes and ears of the lender.  They [sic] are the ones looking out for the lender[.]"  [Id. at 21].  "As a representative and the lawyer for the lender, they [sic] would have an absolute obligation to stop the proceedings and inform the lender if something came up that was unanticipated."  [Id. at 22].  Poe also

30

opined that the closing attorney has an obligation to review the work of all paralegals, including title search paralegals. [Id. at 40-44]. He testified that if the downpayment money came from someone other than the borrower at the time of closing, the closing attorney would have a duty to stop the closing. [Id. at 65]. Poe further testified about the procedures to be followed in depositing closing funds into the attorney's trust account and then disbursing those funds. [Id. at 77-81]. Poe's testimony essentially targeted each element of honest services fraud as charged in the indictment. In each instance, Poe explained in what manner the Defendant had violated her legal, ethical and professional duties as a lawyer and notary public. Poe's testimony did not, however, show honest services fraud as that crime is now defined after Skilling.

Another Government witness, Candice Williams, who testified about title insurance, mentioned honest services fraud at least five times during her testimony. [Doc. 383-4 at 2; 3; 4-5; 6]. Gayle Holder, a Government witness who testified about the duties of a notary public, mentioned four instances of honest services fraud involving the Defendant. [Doc. 383-5 at 5]. At one point during Ms. Holder's testimony, the Court conducted a sidebar during which the prosecution was instructed as follows:

> What you are doing is you are phrasing this question in a way that you are asking this witness to essentially opine that the defendant

has committed honest services fraud. You can word this in a way to where she doesn't have to do that. I determined with regard to Mr. Poe that under 403 that ... the unfair prejudice substantially outweighs the probative value mainly because there's a way you get the probative value in without asking for that opinion.

...

And here, since the honest services fraud goes to whether or not she has abided by a standard and you're asking for an opinion as to whether or not she did, I think -- if it doesn't actually get your toes on the line of 704, it come close enough to where I'm going to hold that it violates 403 and it substantially outweighs ... the probative value.

[Id. at 2-3].

The analysis extends to the prosecution's closing arguments as well as to the evidence. United States. v. Rooney, 37 F.3d 847, 856 (2d Cir. 1994) ("[T]he prosecution encouraged the jury to consider the evidence on [the count it suggests should be sustained] as bearing on [the Defendant's] culpability on the counts [that must now fail.]" Id.; see also United States v. Gjurashaj, 706 F.2d 395, 400 (2[d] Cir. 1983). The prosecution did such here. The Government reiterated and emphasized its honest services fraud theory during closing arguments and has conceded that it did so. [Doc. 384 at 7 ("the Government used the words 'honest services fraud' in summation")]. The Government's closing arguments in particular concentrated on the Defendant's breach of her professional and ethical obligations, and the

characterization of her as a tainted lawyer out for money.  Examples of the

prosecutors' statements made during closing arguments include the following:

(1) "If you wanted a forged notary, she was happy to do it.  If you wanted to lie about who brought the funds to closing, she could fill that gap. ... you need a false Preliminary Title opinion ... she was wiling to do it."   "It was her ethical obligation to read the documents ... review the Warranty Deeds ... tell the truth ... not to take advantage of clients ... to vigorously represent the interests of her client ... and in the process, made $238,000 in one year." [Doc. 380 at 12-13];

(2) "One day she lied 72 times, making for her law firm, $38,000." [Id. at 14];

(3) The Defendant knew what she was doing was wrong because she "passed a Multistate Professional Responsibility Exam all in one try." [Id. at 16];

(4) "[O]n November 29th, 2001, Victoria Sprouse, not her paralegals, ... signed 48 HUD-1 Settlement Statements that had Karin Caterson's signature forged." [Id. at 21];

(5) "That same day Ms. Sprouse notarized 24 warranty Deeds, notarizations in which she said Karin Caterson 'personally appeared before me;' not true."  [Id. at 22];

(6) "She took an oath as a Notary Public of the State of North Carolina to prevent fraud and forgery.  And instead, she committed fraud and notarized forgery." [Id. at 23];

(7) "All in an effort to avoid the no secondary financing instruction, the explicit instruction from Ms. Sprouse's client.  Her client whom she owed a duty to follow their instructions.  Her client whom she owed the duty to represent the interests of.  She ignored the instruction, concocted this six day separation plan, and then forged the document . . ." [Id. at 24];

(8) "Yesterday, she was forced to admit ... she signed documents she knew were not true when she signed them." [Id. at 35];

(9) "She acknowledged this morning, again, that she took money from a client, to do a title search, to examine title records, to examine the record title of the Mecklenburg County records." [Id. at 36];

(10) "[S]he knew on September 12th, 2002 that she was refinancing a fraud. And Rick Poe said that violates an attorney's ethical duty, that's a conflict of interest." [Id. at 41];

(11) "The Judge will also instruct you that there's a scheme to defraud of what's called Honest Services. That Ms. Sprouse has an obligation as an attorney, and as a notary, to act honestly for the benefit of her client. And she can engage in a scheme to defraud if she acts like she's acting like a diligent lawyer, acting like she's living up to her ethical obligations, but then fails to do so." [Id. at 40-41];

(12) "[S]he took fees for signing these documents without doing the title search, without reading the warranty deed." [Id. at 43];

(13) "And that is Honest Services mail fraud. She deprived her client of their right to her services. She told them, I'm functioning as your lawyer, I'm taking money for doing work as your lawyer, and then she failed to do it." [Id.];

(14) "[T]he more money she brought in, the more money she had for overhead. The more she had to pay herself. The more she had for BMW's and beach houses and personal tailors coming to her office to make clothes for her while she was there.... [T]hat ... is motive." [Id. at 83];

(15) "She was the lawyer who played her role in the conspiracy. A role that is necessary for the fraud to happen. ... [S]he used her law license for that.... it's lying about who paid for the house. It's lying about who owned it for money, because that was her role in the fraud, it's the role of the lawyer, it's the role that was necessary[.]" [Id. at 84-85]; and

(16) "[S]he's guilty of Honest Services Fraud, even if you believe her. If you don't do the work, you can't take the money." [Id. at 100].

Even in the Government's brief in opposition to the motion for a new trial, counsel intertwines honest services fraud with money or property fraud:

> Defendant had fiduciary duties to her lender-clients arising from the state law provisions governing the attorney-client relationship. Defendant pretended to be observing these duties, while instead repeatedly violating her duties in order to facilitate the transfer of millions of dollars in loan proceeds to herself and her co-conspirators.... Indeed, if the case were re-tried, the government would make the same arguments -- with different semantics -- ... [and] the same evidence, including the expert testimony regarding an attorney's duties, would be admissible.

[Doc. 384 at 8-9].

The errors regarding honest services fraud also could have affected the outcome of the trial by allowing for "spillover" of prejudicial evidence into an otherwise sustainable count.[8] "Generally, invalidation of the convictions under one count does not lead to automatic reversal of the convictions on other counts." Riley, 621 F.3d at 324-5. Rather, prejudicial spillover analysis requires a finding that "there was a spillover of evidence from the reversed count that would have been inadmissable at a trial limited to the remaining count." Id. If the Court concludes that there was spillover, the Court then

---

[8]The Government does not argue (and indeed does not even address) the issue of prejudicial spillover of evidence.

must determine "whether the error was harmless,[9] that is, whether it is highly probable that the error did not prejudice the jury's verdict on the remaining counts." Id. To determine harmlessness, the Court must conduct a four-part inquiry into whether

> (1) the charges are intertwined with each other; (2) the evidence for the remaining counts is sufficiently distinct to support the verdict on th[ose] counts; (3) the elimination of the invalid count significantly change[s] the strategy of the trial; and (4) the prosecution used language of the sort to arouse the jury.

Id. (internal citations omitted).

Much of the evidence presented and almost all of the arguments of Government counsel during this trial would have been inadmissible and improper in a trial devoted solely to conspiracy to make false statements to banks. The elements of the offense of making false statements are (1) false statements were made to the banks identified in the indictment; (2) the statements were provided to influence the manner in which the bank would act concerning the loans at issue; and (3) the bank was insured by the Federal Deposit Insurance Corporation. 18 U.S.C. §1014. Evidence of the

---

[9] Even though this is couched in terms of harmlessness, the Court in Riley was conducting a plain error analysis. Even though the burden is on the defendant, the question remains whether the error was harmless. See note 4, supra, Hastings, 134 F.3d at 240.

Defendant's ethical and professional obligations to the lenders and buyers would have been inadmissible. Had the Defendant been tried solely on the charges of conspiracy to make false statements to banks, the evidence would have been limited to such things as whether the HUD-1 statements falsely represented that the loan was for a primary residence and/or that the downpayment for the residence came from the buyer and whether the preliminary title opinons misrepresented the identity of the sellers. It would likely have been necessary to exclude evidence concerning the Defendant's ethical obligations and professional duties as a closing attorney to the lender and buyer, the amount of money earned as fees by the Defendant during the scope of the conspiracy, the refinancing of previously false loans (except to the extent another false statement was made), abuse of trust fund accounts, acts contrary to the Good Funds Settlement Act, and the Defendant's motive to earn fees as proof of intent.

For these reasons, the Court must find that it is highly probable that the conceded errors did in fact prejudice the jury's verdict on the conspiracy counts. The charges were "inextricably intertwined." Both counts contain allegations that the Defendant conspired to make false statements to banks and/or to commit honest services fraud. The evidence related solely to making false statements was not distinct – it was "inextricably intertwined"

with evidence of honest services fraud. The intertwined nature of this evidence, coupled with the Government's concentration in opening statements and closing arguments on the honest services fraud theory, likely incited or aroused the jury into convicting the Defendant on the other counts. If all of the evidence on the dismissable counts would otherwise have been admitted on the remaining counts, there would be no prejudicial spillover. United States v. Livingston, 63 F.App'x 106, 107-08 (4th Cir. 2003); see also United States v. Odom, 858 F.2d 664, 666-67 (11th Cir. 1988); Rooney, 37 F.3d at 855. That, however, is far from the case presented here.

For these reasons, the Court must conclude that the errors in the instructions, the indictment, and the admission of evidence concerning honest services fraud actually affected the outcome of the case, thus fulfilling the third element of the plain error analysis.

**Fairness and Integrity Element**

Although the Government has conceded clear error and the Court has concluded that the error affected a substantial right, this Court may exercise its discretion to grant a new trial only if "the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."[10] United States v. Cotton, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). As far

---

[10]The Government did not specifically address this issue in its brief.

as the Defendant's convictions based on this indictment are concerned, it is clear that she was not convicted of fraud by means of bribes or kickbacks as is now required by Skilling. Thus, she is actually innocent of honest services fraud. A court "should no doubt correct a plain forfeited error that causes the conviction ... of an actually innocent defendant[.]" United States v. Olano, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); United States v. Wallace, 515 F.3d 327, 332 (4th Cir. 2008) (noting that a miscarriage of justice occurs when a defendant is actually innocent of the crime charged).

It cannot reasonably be disputed that the Government tried this case on an honest services fraud theory. Any charges regarding money and property fraud or false statements to banks were little more than afterthoughts in the Government's presentation. Honest services fraud was the sum and substance of the prosecution of the Defendant and the jury's conviction of her. As the Defendant is actually innocent of any honest services fraud charge, allowing this verdict to stand would therefore undermine the fairness, integrity and public reputation of this Court and any judicial proceedings conducted herein. The Court, therefore, finds and concludes that the errors as to the jury instructions and the indictment regarding honest services fraud constitute plain error warranting the granting of the Defendant's motion.

For these reasons, the jury verdict must be set aside, and the Defendant

be allowed a new trial conducted in accord with <u>Skilling</u>.


**ORDER**

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for a New

Trial is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the Jury Verdict entered in this matter

on April 1, 2009 [Doc. 236] is hereby **SET ASIDE**.

Signed: June 10, 2011

Martin Reidinger
United States District Judge